# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 07-1419

KAREN S. MCDOWELL, APPELLANT,

v.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued April 7, 2009                          Decided October 13, 2009)

Douglas J. Rosinski, of Columbia, South Carolina, for the appellant.

*Erika E. Liem, Esq.*, with whom *R. Randall Campbell*, *Esq.*, Assistant General Counsel; and *Gayle E. Strommen, Esq.*, Deputy Assistant General Counsel, all of Washington, D.C., were on the brief for the appellee.

Before GREENE, *Chief Judge*, and HAGEL, and SCHOELEN, *Judges*.

SCHOELEN, *Judge*, filed the opinion of the Court. Hagel, *Judge*, filed an opinion concurring in the result and dissenting in part.

SCHOELEN, *Judge*: The appellant, Karen S. McDowell, through counsel, appeals a March 22, 2007, Board of Veterans' Appeals (Board) decision that her minor daughter (hereinafter referred to as T.M.) could not be recognized as a "child" of veteran Ralph R. Dover for purposes of entitlement to VA benefits. Record (R.) at 8. This appeal is timely, and the Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). Although the Board had before it evidence suggesting that the veteran had accepted the appellant's child as his own, the Board did not err by finding the scientific deoxyribonucleic acid (DNA) test results of record more probative to conclude that T.M. was not the veteran's illegitimate child, and thus the Court will affirm the Board's decision.

## I. BACKGROUND

The veteran, Ralph R. Dover, served honorably in the U.S. Army from November 1969 to February 1972, including service in Vietnam.  R. at 13.  In February 1991, he was granted VA compensation benefits for post-traumatic stress disorder (PTSD).  He was hospitalized for this condition from January 14, 1992, through February 18, 1992.  R. at 23, 62.  At the time of his hospitalization, he was also diagnosed with erectile dysfunction.  *Id.*  He died on March 8, 1992, of pneumonia complicated by dehydration.  R. at 29.  He was not married and had no dependents listed in his VA claims file at the time of his death.  R. at 29, 50.

On November 19, 1992, the appellant gave birth to daughter T.M.  R. at 42.  In February 2003, the appellant filed a claim for VA dependency and indemnity compensation (DIC), asserting that T.M. was the veteran's child.  R. at 41-46.  The appellant claimed that she had had a relationship with the veteran.  R. at 91.  She conceded that the veteran was not listed on T.M.'s birth certificate and acknowledged that she did not possess documentation indicating that the veteran was T.M.'s father.  R. at 50.

In July 2003, a VA regional office (RO) advised the appellant of the evidence she could submit that could establish or prove that T.M. was the veteran's daughter.  R. at 95.  In response, the appellant submitted statements from the veteran's relatives (R. at 100, 105-06, 108, 148-49, 166, 175).  Among these statements was a 2003 letter from the veteran's sister, who stated that the veteran was aware of the appellant's pregnancy, that he wanted the child, and "accept[ed] it to be his." R. at 105.  A 2003 letter from a friend of the veteran related that the veteran accepted responsibility as T.M.'s father and that he wanted the child.  R. at 106.  Another sister of the veteran's provided a 2003 letter in which she stated that he "acknowledged this child as his" and "talked about this being his child." R. at 166.  The appellant's roommate also submitted a 2003 letter to VA, stating that the veteran had planned to take care of the appellant and the child.  R. at 175.  The appellant further provided the RO with T.M.'s birth certificate bearing the veteran's name, hand written, identifying him as the father, while all of the other information on the birth certificate had been typewritten.  R. at 117.  The appellant later admitted to the RO that she had written the veteran's name on the birth certificate to demonstrate how the certificate should have been completed.  R. at 148.

2

The appellant also sought DNA testing from an independent agency to show that T.M. was the veteran's child. She provided the DNA results to the RO. R. at 161. That report concluded that, based on the samples provided by T.M. and the veteran's biological sisters, there was a 0.208% probability that the veteran was T.M.'s biological father. *Id*. In January 2006, the RO found that the evidence of record did not establish the veteran was T.M.'s father and denied the appellant's claim. R. at 194-201. The appellant appealed, and in its March 2007 decision, the Board examined the evidence in light of the criteria set forth in 38 C.F.R. § 3.210 (2006). The Board found that there was no legal documentation showing that the veteran was T.M.'s father. R. at 6. The Board also observed that the veteran was hospitalized "during the period in which [T.M.] was allegedly conceived" and that he had been diagnosed with erectile dysfunction, which along with the results of the DNA test, made it highly improbable that the veteran was T.M.'s father. R. at 7. The Board also found that

> the statements of the appellant and others to the effect that the veteran had known that the appellant was pregnant and had accepted the child as his are of less probative value than the results of the genetics testing which make it extremely unlikely that the veteran is [T.M's father].

*Id*. The Board thus concluded that the preponderance of the evidence was against a finding that T.M. was the veteran's "child" for VA benefits purposes. R. at 2, 7. This appeal followed.

On appeal, the appellant argues that the Board is prohibited from considering the February 2004 DNA test results to determine whether T.M. was the veteran's child. She maintains that there is no requirement under 38 C.F.R. § 3.210(b) (2009) that her daughter be biologically the veteran's "child" for VA benefits purposes. Appellant's Brief (Br.) at 8. She also contends that the Board failed to provide an adequate statement of reasons or bases for its decision because it did not sufficiently analyze why DNA test results were deemed more probative than the other evidence purportedly establishing that T.M. was the veteran's child, including the statements from the veteran's family members and friends. *Id*. at 11.

The Secretary contends that, under § 3.210(b), determining whether a child is eligible for benefits as an illegitimate child of a veteran requires that "'the sufficiency of the evidence will be determined [in] accordance with the facts of the individual case,'" and it was therefore permissible for the Board to consider the evidence of DNA test results. Secretary's Br. at 8 (quoting 38 C.F.R.

3

§ 3.210(b)). The Secretary maintains that the Board has a duty to weigh all of the evidence of record, including the negative evidence. *Id.* He also asserts that the Board provided sufficient reasons and bases to support its decision and that the Board properly considered the statements offered to establish that the veteran had accepted that the child was his. Secretary's Br. at 6-7.

In her reply brief, the appellant reasserts her position that the Board may not consider medical evidence in making a determination under § 3.210(b) because that regulation specifically sets forth a list of the type of evidence that "will" be considered and "medical evidence" is not included on that list. Reply Br. at 3.

At oral argument, the appellant asserted that there was no biological requirement in the regulation and therefore the results of the DNA test were irrelevant and should not have been considered by the Board. The Secretary argued that the biological requirement was implicit in the regulation, that the Court should not dismiss such powerful scientific evidence, and that lay testimony that the appellant submitted was not helpful to the appellant's claim in light of the results of the DNA test.

## II. LAW AND ANALYSIS

### A. Required Relationship

Children of a deceased veteran may qualify for DIC benefits if the veteran died from a service-connected or compensable disability. 38 U.S.C. § 1310. "Child" is defined by the statute, in relevant part, as a person who is unmarried, under the age of 18 years, and who is

> *a legitimate child*, *a legally adopted child*, *a stepchild* who is a member of a veteran's household or was a member at the time of the veteran's death, *or an illegitimate child* but, as to the alleged father, only if acknowledged in writing signed by him, or if he has been judicially ordered to contribute to the child's support or has been, before his death, judicially decreed to be the father of such child, or if he is otherwise shown by evidence satisfactory to the Secretary to be the father of such child.

38 U.S.C. § 101(4)(A) (emphasis added).

The appellant has made no assertion, nor does the evidence of record demonstrate that the appellant and the veteran were ever married, thus excluding the possibility that T.M. could be the veteran's legitimate child or stepchild. Moreover, because the child was not born before the veteran died, he could not have legally adopted her.

4

The Secretary has promulgated a regulation implementing the statutory definition of "illegitimate child" of a veteran, which states:

> As to the mother of an illegitimate child, proof of birth is all that is required. As to the father, the sufficiency of evidence will be determined in accordance with the facts in the individual case. Proof of such relationship will consist of:
>
> (1) An acknowledgment in writing signed by him; or
>
> (2) Evidence that he has been identified as the child's father by a judicial decree ordering him to contribute to the child's support or for other purposes; or
>
> (3) Any other secondary evidence which reasonably supports a finding of relationship, as determined by an official authorized to approve such findings, such as:
>
>> (i) A copy of the public record of birth or church record of baptism, showing that the veteran was the informant and was named as parent of the child; or
>>
>> (ii) Statements of persons who know that the veteran accepted the child as his; or
>>
>> (iii) Information obtained from service department or public records, such as school or welfare agencies, which shows that with his knowledge the veteran was named as the father of the child.

38 C.F.R. § 3.210(b) (2009).

The appellant does not contend that § 3.210(b) is not a reasonable interpretation of section 101(4)(A). *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-843 (1984) (setting forth principles for administrative interpretation of statutes). Rather, the question is whether the Secretary correctly interpreted the regulation he promulgated. In the decision below, the Secretary, by finding the results of the DNA test to be the most probative evidence for a finding of relationship under § 3.210(b), interpreted the regulation as containing a biological element, and the appellant argues this interpretation was incorrect. We note that we are obligated to pay substantial deference to the Secretary's interpretation of his own regulations, and that his interpretation is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Smith v. Nicholson*, 451 F.3d 1344, 1349-50 (Fed. Cir. 2006); *see also Auer v. Robbins*,

519 U.S. 452, 461-62 (1997) (noting that deference must be afforded to an agency's interpretation of a regulation even where that interpretation is first advanced in a legal brief).

When interpreting regulations, we consider the standard meaning of words. "Without standard word meanings and rules of construction, neither Congress nor the Secretary can know how to write authorities in a way that conveys their intent and no practitioner or – more importantly – veteran can rely on a statute or regulation to mean what it appears to say." *Tropf v. Nicholson*, 20 Vet.App. 317, 322 n.1 (2006). "Illegitimate" is one who is "born of parents not married to each other." WEBSTER'S NEW WORLD DICTIONARY (WEBSTER'S) 672 (3d ed. 1988); *see also* RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 953 (2d ed. 2001) (defining "illegitimate" as "born of parents who are not married to each other; born out of wedlock: *an illegitimate child*"). "Born of parents" indicates a biological connection between the parents and the child. As such, we are in agreement with the Secretary that the phrase "illegitimate child," as used in § 3.210(b), encompasses a biological relationship between parent and child.[1]

Importantly, in reading the regulation as a whole, we see no inconsistencies between a prerequisite of a biological relationship and § 3.210(b)'s "sufficiency of the evidence" provision or the evidence listed as "proof of . . . relationship," nor has the appellant demonstrated any such conflicts. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) (concluding that appellant had the burden of demonstrating error on appeal). An acknowledgment by the father that he is the father can easily be read as an acknowledgment by the father that he knows himself or believes himself to be the biological father.[2] *See* 38 C.F.R. § 3.210(b)(1). A judicial decree identifying a man as a child's father would generally be based on a court finding that that man has been determined to be the biological father of the child. *See* 38 C.F.R. § 3.210(b)(2).

_____

[1]Our dissenting colleague cites to a variety of legal and general use dictionaries in an effort to show that the term "illegitimate child" has nothing to do with the relationship between the child and his or her biological parents. However, even using the definitions of the term he cites to (most of which define "illegitimate child" as "a child born out of wedlock"), it is clear that the term describes more than just the child himself or herself – it also implicitly describes the relationship between the child and his or her biological parents. After all, the reason the child is "born out of wedlock" is because his or her biological parents were not married to each other.

[2]Such a reading is consistent with the Uniform Parentage Act, which as to "acknowledgment of paternity" provides that "[t]he mother of a child and a man claiming to be the *genetic* father of the child may sign an acknowledgment of paternity with intent to establish the man's paternity." UNIFORM PARENTAGE ACT (UPA) (amended 2002) § 301 (emphasis added).

After noting that "there is no need for any of the Secretary's requirements to be 'implied,'" *infra* at ___, our dissenting colleague finds that the regulation requires that the father must have assumed parental responsibilities in order for a relationship to exist. However, no such requirement appears in the language of the regulation and if it exists, it must be implied. Under § 3.210 (b)(1), the father may acknowledge the child in writing. Under § 3.210 (b)(3), the father may be listed on public records such as baptism, school, or birth records. This subsection also provides for statements by others that know the veteran accepted the child as his. None of these provisions mention any form of responsibility for an ongoing parental relationship. Only § 3.210(b) references a court order of child support, which admittedly creates an ongoing financial relationship; nevertheless, it does not necessarily demonstrate an ongoing parental relationship as envisioned by the dissent.

Unlike our dissenting colleague, our analysis is not based on the definition of "father." We are concentrating on the statute's and regulation's use of "illegitimate child," which as stated above, connotes a biological relationship. Although we agree with the dissent that there are many ways that one can establish a paternal relationship with a child that is not one's biological child, and we in no way mean to devalue those relationships, for a child to be the "illegitimate child" of the person for purposes of § 3.210(b), the child must be "born of" and therefore biologically linked to the parent. *See* WEBSTER'S, *supra*. We are not holding, of course, that there are no means by which a child who is not biologically related is eligible to receive VA benefits; rather, our holding relates only to the "illegitimate child" provision of § 3.210(b). Indeed, it would be contradictory to both the regulation and section 101(4)(A) if we were to hold that a biological relationship is *always* required for *every* child seeking VA benefits. To the contrary, subsections (c) and (d) of § 3.210(b) clearly set forth instances that allow for children who are not biologically connected to the veteran to receive VA benefits.[3]

The inclusion of a biological requirement within the term "illegitimate child" as it is used in § 3.210 is also consistent with proposed rule changes to the regulatory scheme at issue in this case.

---

[3] It appears as though VA has previously required a biological element under section 101(4). In *Burch v. Brown*, the Court affirmed a Board decision that noted that dependent children in question were not living in the veteran's household at the time of his death or adopted by the veteran and found that because the children were "not the biological children of the veteran" that "they [did] not fall within the purview of the VA's definition of 'child' for the purposes of improved death pension benefits." 6 Vet.App. 512, 513 (1994).

Notably, the proposed rule for establishing status as a child for VA benefit purposes attempts to eradicate use of the terms "legitimate" and "illegitimate." *See* Dependents and Survivors, 71 Fed. Reg. 55,052, 55,069 (proposed Sept. 20, 2006) ("Content of Proposed Regulations"). Rather, the proposed rules indicate that the new regulation will use the term "natural child" to describe both categories of children. *Id.* "Natural child" means "[a] child by birth, as distinguished from an adopted child . . . [a]lso termed *biological child*." BLACK'S LAW DICTIONARY 232-33 (7th ed. 1999) (hereinafter BLACK'S). Comments to the proposed rule indicate that "[t]he proposed change in language is not intended to either diminish or enlarge the group of eligible claimants," a suggestion that the biological requirement is a requirement in both the new and old regulation.

We note finally that requiring a biological component for establishing the necessary relationship under § 3.210(b) not only prevents a situation where benefits must be provided in the absence of any established relationship between a veteran and child, but also ensures that those children who do have a biological connection with a veteran will be able to obtain benefits even in situations where the child was unable to establish a relationship with a veteran by other means.

B.  "Proof" of Relationship

Having found that the regulatory definition of "illegitimate child" inherently encompasses a biological relationship, we next must determine whether it was appropriate for the Board to consider the results of a DNA test. As described, § 3.210(b) sets forth a list of "proof" of the relationship for establishing that a child is an illegitimate child.

The evidence before the Board consisted solely of (1) statements of friends and relatives of the veteran that aver that he accepted the child as his and (2) the genetic test results obtained and submitted by the appellant. The appellant, noting that a DNA test is not listed in § 3.210(b), asserts that *only* evidence listed under the designation "proof" in § 3.210(b) may be considered when VA is determining whether a relationship exists for purposes of the regulation. Accordingly, she maintains that the evidence she provided satisfies the "[p]roof of [a] relationship" to establish the necessary relationship regardless of the DNA evidence of record. We note that, at oral argument, the appellant conceded that the DNA evidence she now argues the Board should not have considered in making its determination was obtained and submitted by her of her own volition and not at the behest of the Secretary.

8

"Proof" does not necessarily mean, as the appellant would have us believe, evidence that irrefutably establishes a claim (in this case, the existence of the necessary biological relationship between the child and the father). Rather, proof is also evidence "serving or tending to establish the truth of something." WEBSTER'S at 1077; *see also* BLACK'S at 1231 (defining "proof" as evidence that, when persuasive, determines the judgment of the reviewing body). Examining § 3.210(b), we are persuaded that "proof," as used in that regulation, introduces a list of evidence that merely "tend[s] to establish the truth" of the necessary relationship. Although we generally consider the standard meaning of words when interpreting a regulation, we will not interpret a term in a regulation so that its reading creates an inconsistency with another part of that regulation. *See Roper v. Nicholson*, 20 Vet.App. 173, 178 (2006) (VA statutory and regulatory scheme "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error" (quoting 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION, § 46:05 (6th ed. 2000)). Here, the term "proof" includes "[a]ny other secondary evidence which reasonably supports a finding of relationship." *See* 38 C.F.R. § 3.210(b)(3). If "proof" is interpreted to mean evidence that conclusively and irrefutably establishes that relationship (as opposed to evidence that only *tends* to establish that relationship), the submission of *any* favorable evidence indicating a relationship would necessarily mandate a finding that an individual is a child for VA benefits purposes, a result that is inconsistent with the regulation's requirement that is "the sufficiency of evidence will be determined in accordance with the facts in the individual case." *Id.*

Moreover, the appellant's interpretation of "proof" is wholly inconsistent with this Court's caselaw that has long held that the Board has a duty to find facts and assess the weight and credibility of the evidence. *See Owens v. Brown*, 7 Vet.App. 429, 433 (1995). Thus, in order to give meaning to the sufficiency-of-evidence provision in § 3.210(b) and in keeping with this Court's caselaw, we hold that a claimant cannot irrefutably establish that a child is an illegitimate child of a veteran merely by proffering any of the evidence listed under "proof" in that regulation. *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (holding that when interpreting a statute [or regulation], the court is required to look at the context and provisions of law as a whole); *Splane v. West*, 216

9

F.3d 1058, 1068-69 (Fed. Cir. 2000) ("Canons of construction . . . require us to give effect to the clear language of a [regulation] and avoid rendering any portions meaningless or superfluous."); *Owens*, *supra*. Thus, we conclude that because an illegitimate child must be biologically related to his parents, it was not inappropriate for the Board to consider evidence related to the question of that biological relationship, i.e., the DNA test results.

Our dissenting colleague relies a great deal on the regulatory history of § 3.210 but fails to acknowledge that the history he relies on is from a time when DNA was not considered as reliable or acceptable as it is today. He maintains that the regulation was "*originally* founded on the basis of parental relationship instead of biological requirement." *Infra* at __ (emphasis added). However, as described, illegitimacy connotes a biological relationship, and as early as 1927, the regulation included the provision that proving a relationship to a veteran "shall be shown by the best evidence obtainable." VETERANS BUREAU REGULATION 178 § 33 (a)-(d) (Aug. 25, 1927). We can think of no better way than a DNA test to establish that a biological connection is present. The results of DNA tests are now widely recognized as a reliable and accurate method for establishing biological paternity. *See Tipps v. Metro. Life Ins. Co.*, 768 F.Supp. 577, 579 (S.D. Tex. 1991) ("Scientific paternity testing . . . is now a well established and accepted method of determining whether a specific individual is a child's biological father."); *Estate of Sanders*, 3 Cal. Rptr. 2d 536, 544 (Cal. Ct. App. 1992) (noting that "only the proverbial ostrich with its head in the sand would dispute" the remarkable advances in DNA technology in removing the uncertainty of proving paternity). "Congress itself has acknowledged that genetic testing is extremely reliable." *Miller v. Christopher*, 96 F.3d 1467, 1474-75 (D.C. Cir. 1996); H. REP. NO. 527, 98th Cong., 1st Sess., at 38 (1983). Reliability has been recognized even in cases where the testing is of the genetic material of a collateral party, such as a decedent's relative. *See Tipps*, 768 F.Supp. at 579-80 (finding that DNA evidence from living relatives could be used in determining whether a biological relationship existed). Moreover, the vast majority of cases we have reviewed indicate that courts are strongly in favor of determining biological paternity by use of DNA tests. *See id.* at 580 (noting that Texas courts have accepted DNA technology); *Alexander v. Alexander*, 537 N.E.2d 1310, 1314 (Franklin County, Ohio C.P. 1988) (noting that the "accuracy and infallibility of the DNA test are nothing short of remarkable"). Indeed, to obtain a judicial decree of paternity in Georgia, the state in which T.M.

10

was born, there is a "rebuttable presumption of paternity of a child born out of wedlock if there has been performed scientifically credible parentage-determination genetic testing which establishes at least a 97 percent probability of paternity." GA. CODE ANN. § 19-7-46(b) (2008).

In this instance, DNA has provided the best evidence now obtainable for establishing a veteran is the father of an illegitimate child, and DNA evidence, where presented, can be considered when determining the sufficiency of evidence in accordance with the facts in that individual case. As our dissenting colleague notes, the Secretary has the authority to update regulations as he sees fit, and perhaps he will wisely undertake to explicitly address DNA testing at some point, but that is not necessary for our holding here today.

In summary, VA may consider the results of a DNA test when determining whether a child is an "illegitimate child" for purposes of the regulation. We do not hold that VA must always rely exclusively on the results of a DNA test, as the relationship may be proven by other evidence. We also do not hold that VA can require a claimant to submit to a DNA test.

## C. Reasons and Bases

When deciding a matter, the Board must include in its decision a written statement of the reasons or bases for its findings and conclusions, adequate to enable an appellant to understand the precise basis for the Board's decision as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Allday v. Brown*, 7 Vet.App. 517, 527 (1995); *Gilbert v. Derwinski*, 1 Vet.App. 49, 56-57 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of the evidence, account for the evidence that it finds persuasive or unpersuasive, and provide the reasons for its rejection of any material evidence favorable to the claimant. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995); *Gilbert*, 1 Vet.App. at 57.

The appellant maintains that the Board failed to provide an adequate statement of reasons or bases for determining that the lay testimony submitted by the appellant was less probative than the DNA test results. Appellant's Br. at 11. Contrary to the appellant's contention, the Board considered and discussed all of the favorable evidence in the record including the lay statements submitted by the appellant. R. at 6-7. The Board found that the evidence against the appellant's claim consisted of T.M.'s birth certificate that did not list the veteran as her father, a VA hospital report that stated the veteran was hospitalized from January 14, 1992, to February 18, 1992, and the DNA report

11

demonstrating the very low probability that the veteran was T.M.'s biological father. R. at 6. The Board concluded that based on the facts in this case, the favorable lay statements were less probative than the DNA test results, and thus, found the preponderance of the evidence was against recognizing T.M. as the veteran's child for VA benefits purposes. R. at 7.

In this case, the appellant has not disputed the accuracy or reliability of the DNA test. As described above, the evidentiary concerns in a paternity finding are largely eliminated by the use of DNA testing, and thus, we hold that the Board properly considered the results of the DNA test when weighing the sufficiency of the evidence in this case. *See* 38 C.F.R. § 3.210(b). Moreover, as stated above, the Board discussed all the relevant evidence in the record and weighed it accordingly. R. at 6-7. As such, the Board provided a statement of reasons or bases adequate to enable the appellant to understand the precise basis for the Board's decision as well as to facilitate review in this Court. *See Allday* and *Gilbert*, both *supra*. Accordingly, that decision will be affirmed.

## IV.  CONCLUSION

After consideration of the appellant's and the Secretary's pleadings, and a review of the record, the Board's March 22, 2007, decision is AFFIRMED.

HAGEL, *Judge*, concurring in the result, dissenting in part:  I concur with the majority's ultimate conclusion that the child is not entitled to benefits. However, I write separately because I believe that, in drafting 38 C.F.R.§ 3.210, the Secretary intentionally omitted a requirement of biological paternity as a precondition to a child's receipt of benefits under 38 U.S.C. §§ 1313 and 1314. I would find that the regulation requires the assumption of paternal responsibility and the establishment of a paternal relationship as the basis for the child's benefits, rather than a relationship based on biology. Consequently, because the Board relied solely on the results of a DNA test to establish paternity, it committed error. Because Mr. Dover did not establish a paternal relationship with T.M. before Mr. Dover's death, however, the Board's error is harmless.

12

# I. REGULATORY BASIS

Any analysis of a regulation begins with the statute upon which it is promulgated. This analysis begins with "'the language of the statute' [a]nd where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (internal citations omitted); *see Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992). The specific statute covering this issue is 38 U.S.C. § 101(4)(A), which states that a veteran may be proven a "father" of an "illegitimate child" if there is an "acknowledg[ment] in writing signed by him, or if he has been judicially ordered to contribute to the child's support or has been, before his death, judicially decreed to be the father of such child, or if he is otherwise shown by evidence satisfactory to the Secretary to be the father of such child."

The statute distinguishes between a judicial decree for child support and a judicial decree determining a person to be the father. 38 U.S.C. § 101(4)(A)(iii). If biological parentage was all that was envisioned in the statute then there would be no need to differentiate between judicial decrees determining biology and those determining legally required child support.

There is nothing in the statutory provision defining "child" that mentions or implies the necessity of a biological relationship, a requirement that could have easily been added by the Secretary in one of his 15 republications or revisions of this regulation.[4] Consequently, a person may be a "father" without being the biological father of a child, but merely the legal father based on an assumption of parental responsibility.

The majority finds that there is biological requirement based on the *Webster's New World Dictionary* definition of "illegitimate": "born of parents not married to each other." *Ante* at __ (citing WEBSTER'S NEW WORLD DICTIONARY 672 (3d ed. 1988) and RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 953 (2d ed. 2001)). The majority determines that the phrase "'[b]orn of

---

[4] VA RULES AND PROCEDURES § 1053 (May 19, 1930); VA RULES AND PROCEDURES § 1040(a)-(d) (May 19, 1930); VA RULES AND PROCEDURES §§ 1045(B), 1046(A)-(E) (Jan. 25, 1936); VA RULES AND PROCEDURES §§ 1045(B), 1046(A)-(G) (July 10, 1940); VA RULES AND PROCEDURES § 1046(A) (Jan. 12, 1943); VA RULES AND PROCEDURES § 1041(A) (Nov. 26, 1945); VA RULES AND PROCEDURES § 1046(A)-(F) (May 21, 1945); VA RULES AND PROCEDURES § 1041(A) (Nov. 26, 1945); VA RULES AND PROCEDURES § 1046(A)-(F) (May 13, 1947); VA RULES AND PROCEDURES § 1045(B) (May 19, 1948); VA RULES AND PROCEDURES § 1045(B) (Oct. 28, 1954); 38 C.F.R. § 3.210(B) (1959); 38 C.F.R. § 3.210(B) (1963); 38 C.F.R. § 3.210(b) (1987); 38 C.F.R. § 3.210(b) (1994); 38 C.F.R. § 3.210(b) (1995); 38 C.F.R. § 3.210(b) (1996); 38 C.F.R. § 3.210(b) (1997). For further discussion of the regulatory history see Part II(B)(1) below.

parents' indicates a biological connection must be present." *Id.* However, I believe that the term "illegitimate child" is a legal term with a unique meaning within the law and, therefore, I find *Black's, Barron's, Bouvier's, and Ballentine's **Law** Dictionaries* more enlightening. *See Sullivan v. Stroop*, 496 U.S. 478, 482-83 (1990); *Marvel v. Merritt*, 116 U.S. 11 (1885); *Dow Chem. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372-73 (2001) (the Federal Circuit has "cautioned against the use of non-scientific dictionaries, 'lest dictionary definitions . . . be converted into technical terms of art having legal, not linguistic significance.'" (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998))); *Robinson v. City of Detroit*, 613 N.W.2d 307, 316 n.13 (Mich. 2000).

The law dictionaries define "illegitimate child" as simply one "born out of wedlock." BLACK'S LAW DICTIONARY 239 (6th ed. 1990) [hereinafter BLACK'S]; BARRON'S LAW DICTIONARY 235 (4th ed. 1996) ("as applied to children, it means those born out of wedlock"); BOUVIER'S LAW DICTIONARY, Volume 1, at 1491 (8th ed. 1914) ("it is usually applied to children born out of lawful wedlock"); BALLENTINE'S LAW DICTIONARY 580 (3d ed.1969 ) ("a child born out of wedlock"). None of the law dictionaries contain the phrase "born of parents" or any other phrase implying a biological connection.

Additionally, the U.S. Supreme Court has determined that a dictionary definition is incorrect and therefore must be discounted when the "meaning set forth in a single dictionary (and, as we say, its progeny) not only *supplements* the meaning contained in all other dictionaries, but *contradicts* one of the meanings contained in virtually all other dictionaries." *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 226-28 (1994). Here, the *Webster's* definition adds an additional requirement, "born of parents," that is not present in the law dictionaries or even other general usage dictionaries. OXFORD ENGLISH DICTIONARY, Volume 9 at 652 (2d ed. 1989) ("Not born in lawful wedlock; nor recognized by law as lawful offspring"); THE AMERICAN COLLEGE DICTIONARY 601 (1962) ("born out of wedlock: an illegitimate child"); NEW STANDARD DICTIONARY OF THE ENGLISH LANGUAGE 734 (1940) ("born out of wedlock"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 640 (4th ed. 2000) ("Born out of wedlock."); COLLINS WEBSTER'S DICTIONARY 240 (3d ed. 2003) ("born out of wedlock"); THE NEW AMERICAN WEBSTER DICTIONARY 365 (4th ed. 2006) ("born out of wedlock"). The *Webster's* definition "supplements the meaning contained in all other

dictionaries" and "contradicts one of the meanings contained in virtually all other dictionaries," and therefore is incorrect and must be discounted. *MCI Telecomms. Corp.*, 512 U.S. at 226-28.

Further, the term "born of parents" is ambiguous, as it requires a determination of the meaning of the word "parent." Following the majority's lead, the *Webster's* definition of "parent" is "a mother or father." WEBSTER'S NEW WORLD DICTIONARY 982 (3d ed. 1988). Again, the terms are ambiguous and accordingly, *Webster's* defines "father" as "a man who has begotten a child . . . a stepfather . . . an adoptive father . . . a father-in law . . . a person regarded as a male parent." *Id*. at 493. The definitions from *Webster's* do not substantially clarify the terms, and certainly do not indisputably impute a biological requirement. Therefore, further analysis is required; analysis that the majority fails to provide. The majority makes no further arguments or justifications for its determination that there is a biological requirement. The sole basis of their argument rests on the *Webster's New World Dictionary* definition. However, I believe that every logical step the majority makes from there is in error because, just as when building a house, it is irrelevant how well the brickwork is done if the foundation is faulty. *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 115-16 (1949) ("[O]ne may not fully comprehend the statute's scope by extracting from it a single phrase . . . and getting the phrase's meaning from the dictionary or even from dissimilar statutes."); *Jordan v. De George*, 341 U.S. 223, 234 (1951) (Jackson, J., dissenting) (describing dictionaries as "the last resort of the baffled judge"); *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Judge Learned Hand stating that "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary") *aff'd*, 326 U.S. 404 (1945) .

*Black's Law Dictionary* defines "parent" as "[t]he *lawful* father or mother of someone." BLACK'S at 1114 (emphasis added). The *Black's* definition focuses on a legal requirement instead of a biological one. Further, there is no disagreement between the parties that the child was born out of wedlock. The disagreement arises from the question of who qualifies as a "father" under 38 C.F.R. § 3.210 and thus the person from whom VA benefits to the child flow. The primary focus of this dissent will be on the issue of how to determine who is the father for purposes of 38 U.S.C. § 101(4)(A)(iii) and its implementing regulation 38 C.F.R. § 3.210. The definition of "father" includes, "[a]s used in law, this term may include a putative as well as legal father, also a stepfather, an adoptive father, or a grandfather." BLACK'S at 608. Additionally, the definition of "father" at

15

38 C.F.R. § 101(5), though not directly applicable to the facts of this case, likewise does not require a biological relationship to establish that a person is a parent. The specific examples listed in 38 C.F.R.§ 101(5) illustrate that a biological requirement is not the only consideration in determining who is the "father." [5]

The statute at issue in this case allows the Secretary to determine what additional evidence is satisfactory to establish a paternal relationship. 38 U.S.C. § 101(4)(A)(iii). As the Supreme Court has stated,

> If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Chevron, U.S.A. v. NRDC, Inc.*, 467 U.S. 837, 843-44 (1984). The Secretary has promulgated 38 C.F.R. § 3.210 to "fill the gap" and provide further guidance on what other evidence is satisfactory to him to establish fatherhood under 38 U.S.C. § 101(4)(A)(iii). *Chevron,* 467 U.S. at 843-44; *see Morton v. Ruiz,* 415 U.S. 199, 231-32 (1974); *United States v. Baer*, 324 F.3d 282, 286 (4th Cir. 2003); *Dofasco Inc. v. United States*, 28 C.I.T. 263, 274 (2004).

The text of § 3.210, the contents of which has remained unchanged since 1994,[6] provides:

> As to the mother of an illegitimate child, proof of birth is all that is required. As to the father, the sufficiency of evidence will be determined in accordance with the facts in the individual case. Proof of such relationship will consist of:
> (1) An acknowledgment in writing signed by him; *or*
>
> (2) Evidence that he has been identified as the child's father by a *judicial decree* ordering him to contribute to the child's support or for other purposes; *or*
>
> (3) Any other secondary evidence which reasonably supports a finding of *relationship,* as determined by an official authorized to approve such findings, such as:

---

[5] "The term 'parent' means . . . a father, mother, a father through adoption, . . . *or an individual who for a period of not less than one year stood in the relationship of a parent* to a veteran at any time before the veteran's entry into active military, naval, or air service . . . ." 38 U.S.C. § 101(5) (emphasis added).

[6] Except for the removal of the words "A certified copy" before § 3.210(b)(3)(i), the regulation has remained unchanged since 1963. For further discussion of the regulatory history, see Part II(B)(1) below.

16

(i) A copy of the public record of birth or *church record of baptism,* showing that the veteran was the informant and was named as parent of the child; *or*

(ii) Statements of persons who know that the veteran accepted the child as his; *or*

(iii) Information obtained from service department or public records, such as school or welfare agencies, which shows *that with his knowledge the veteran was named as the father* of the child.

38 C.F.R. § 3.210(b) (emphasis added).

The Secretary argues that there is a requirement that an illegitimate child be the biological offspring of the veteran. Although that requirement does not appear anywhere in the text of § 3.210(b), the Secretary argues that the requirement is implied. Thus, at issue is the Secretary's interpretation that there is an implied requirement in this regulation that a child must be the biological offspring of the veteran in order to receive benefits under 38 U.S.C. §§ 1313 and 1314. In accordance with this, the Secretary urges that his interpretation of the regulation should be given "substantial judicial deference" and is valid unless "arbitrary, capricious, or manifestly contrary to the statute." *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 219-20 (2001); *Chevron,* 467 U.S. at 843-44.

A court must give deference to an agency's interpretation of a regulation only if it is "longstanding" and the words "are not self-explanatory, and reasonable men could easily differ as to their construction." *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981) (noting that the statute in question specifically delegated authority to the agency to define the statute's words); *see Auer v. Robbins*, 519 U.S. 452, 462 (1997) (noting that an interpretation of a regulation provided during the course of litigation can be treated with deference so long as it is a fair and considered interpretation of the regulation by the official designated by statute to do so and not one developed as a response to litigation). Thus, the next determination must be whether the Secretary's interpretation is self-explanatory and longstanding.

17

## II.  REGULATORY INTERPRETATION

### A. Self-Explanatory Requirement

The regulation, as quoted verbatim above, specifically states that "proof" of being a father for an illegitimate child[7] "*will* consist of (1) . . . *or* (2) . . . *or* (3)."  38 C.F.R. § 3.210(b) (emphasis added).  The use of the disjunctive conjunction "or" to join the alternative components in the regulation's list of proof is exhaustive and clear.[8]  There is simply no room for the finding of an implied requirement for biological paternity.  The use of DNA or other biological tests for establishing paternity have been used in the U.S. court system since 1987.  *DA's Office v. Osborne*, 129 S. Ct. 2308, 2316 (2009); *Andrews v. State*, 533 So.2d 841, 842-43 (Fla. Dist. Ct. App. 1989); *Spencer v. Commonwealth*, 384 S.E.2d 775 (Va. 1989); *see infra* Part II(B)(1).   If the Secretary wanted to require a biological relationship, as he now argues, he certainly would have or at least could have and possibly should have, included that requirement in the regulation with clear language, rather than leaving it to be discovered by implication.  *See Cook v. Principi*, 318 F.3d 1334, 1339 (Fed. Cir. 2002);  *Nissan Motor Mfg. Corp. v. United States*, 12 C.I.T. 737, 740 (1988) ("A general rule of statutory construction is that the expression of one thing is the exclusion of the alternative, *expressio unius est exclusio alterius*."); *cf. McGautha v. California*, 402 U.S. 183, 206 (1970); *Ward v. Illinois*, 431 U.S. 767, 781 (1977) (Brennan, J., dissenting); *Mauerhan v. Principi*, 16 Vet.App. 436, 442 (2002).  The Secretary promulgates the regulations from authority given by Congress and is free to write or change them as he sees fit and therefore there is no need for any of the Secretary's requirements to be "implied."

### 1. Acknowledgment in Writing

The first item enumerated in § 3.210(b)  that can be used as proof of a paternal relationship is "an acknowledgment in writing."  38 C.F.R. § 3.210(b)(1).  *Black's Law Dictionary* defines "Paternity Acknowledgment" as an "admission that the child is one's own. *Recognition of a paternal relation,* either by a written agreement, verbal declarations or statements, by the life, acts, and

---

[7] The definition of "child" used in the regulation mirrors the definition in 38 U.S.C. § 101(4)(A).

[8] "Or, *conj.* A disjunctive particle used to express an alternative or to give a choice of one among two or more things. . . . The word 'or' is to be used as a function word to indicate an alternative between different or unlike things." BLACK'S at 1095.

conduct of the parties, or any other satisfactory evidence that the relation was recognized and admitted." BLACK'S at 23. The majority states that "[a]n acknowledgment by the father that he is the father can be read as an acknowledgment by the father that he knows himself or believes himself to be the *biological* father." *Ante* at ___ (emphasis added). However, an acknowledgment in writing of a paternal relationship is logically based on an assumption of responsibilities rather than a biological requirement. An adoption of a child is based on an acknowledgment of paternal responsibilities, not on an adoptive parent's belief that there is a biological basis for paternity. Further, even if there is a possible biological element, based on the *Webster's New World Dictionary* definition used by the majority, that definition is not the final determination of an acknowledgment. The basic premise of a signed writing implies a contractual rather than biological requirement. The first item in the regulation is fully encompassing and self-explanatory and nowhere is there a biological requirement.

## 2. Judicial Decree

The second item that can be used as proof of a paternal relationship is a "judicial decree ordering [the father] to contribute to the child's support or for other purposes." 38 C.F.R. § 3.210(b)(2). The majority opinion states that "[a] judicial decree identifying the father as the child's father would generally be based on a court finding that the father has been determined to be the biological father of the child." *Ante* at ___. However, the emphasis of this portion of the regulation is on assumption of responsibilities for the child's welfare rather than on any biological requirement. The statute delegating authority to the Secretary specifically distinguishes between a judicial decree for child support and a judicial decree determining a person to be the father. 38 U.S.C. § 101(4)(A)(iii). That statute and the regulation both can only be interpreted to mean that a parental relationship can be based on the assumption of parental responsibility or a judicial order conferring parental responsibilities. If the only requirement was a biological one, then the statute or the regulation could have listed only judicial decrees determining *paternity* as "proof" instead of judicial decrees ordering child support. Thus, the second item is self-explanatory and does not include a biological requirement.

19

### *3. Other Secondary Evidence*

The third item that may be used to establish paternity under the regulation includes "other secondary evidence" and lists three possibilities of such evidence. 38 C.F.R. § 3.210(b)(3). Again, the list is exhaustive stating "(i) . . . *or* (ii) . . . *or* (iii)." 38 C.F.R. § 3.210(b)(3). The first and third items in this list cover records that report the person as father, such as "public record of birth or church record of baptism" and "service department or public records, such as school or welfare agencies." 38 C.F.R. § 3.210(b)(3)(i), (iii). This list is essentially the same as that listed in 38 C.F.R. § 3.210(b)(1). These items are nothing more than evidence of an "acknowledgment" of paternity in various types of records and, as stated above, acknowledgments that consider assumption of responsibilities instead of biology as the basis for determining parenthood. The majority states that "[n]one of these provisions [(38 C.F.R. § 3.210(b)(3)(i), (iii))] mention any form of responsibility for an ongoing parental relationship." *Ante* at __. However, the type of evidence listed in 38 C.F.R. § 3.210 is designed to prove a paternal relationship by describing a man who accepted responsibility for a child by demonstrating that he is concerned with the child's well-being and being actively involved in the child's life; the evidences is not designated to prove the child's genetic origins. A listing on the record of baptism shows assumption of responsibility for the child's spiritual well-being; school records show assumption of responsibility for the child's mental well-being; and welfare records show assumption of responsibility for the child's economic well-being.

The second item specifically states; "Statements of persons who know that the veteran accepted the child as his." 38 C.F.R. § 3.210(b)(3)(ii). Such statements attest whether the person demonstrated an assumption of parental responsibilities recognizable and attestable to third parties, not whether the child was the man's biological child. As explained above, each of the items listed in the regulation is specified by the Secretary as well as being self-explanatory. None include a biological requirement. Instead each is based on the assumption of parental responsibility and establishment of a paternal relationship.

After a review of the statute and regulation, I find that each item under the regulation is self-explanatory and none include a biological requirement. Further, I would find that the satisfactory establishment of any of these requirements would identify the male veteran as the father and would thus entitle the child to VA benefits flowing from him.

B. Longstanding Requirement

*1. Regulatory History*

The regulatory history of 38 C.F.R. § 3.210 begins in 1924 with the World War Veterans Act. World War Veterans' Act § 3(d) (1924). At that time, the Veterans Bureau was invested with the duty to promulgate regulations concerning the issue at hand. Regulation concerning veterans benefits, including this matter, was then controlled by the Veterans Bureau. In the World War Veterans' Act, Congress defined "child" to include illegitimate children "but, as to the father only, if acknowledged in writing signed by him, or if he has been judicially ordered or decreed to be the putative father of such child." WORLD WAR VETERANS' ACT § 3(d) (1924). The 1927 version of the regulation, which remained virtually unchanged until 1930, stated that a parental relationship could be proven through public records, statements from two or more persons who knew of the relationship, or a statement from a physician or midwife. VETERANS BUREAU REGULATION 178 § 33 (a)-(d) (Aug. 25, 1927); *see* VETERANS BUREAU REGULATION 189 § 33 (a)-(d) (Aug. 4, 1928); VETERANS BUREAU REGULATION 189 §33 (a)-(d) (May 28, 1928).

In July 1930, VA was established, incorporating the functions of the Veterans Bureau. In May 1930, VA set forth the first regulation covering paternity for benefits purposes. VA RULES AND PROCEDURES § 1053 (May 19, 1930). Although this regulation was written to determine who was considered the father of a veteran for the purposes of benefits flowing from the veteran to a parent, the key point is that the definition of the parent of the child was, as the Veterans Bureau regulation discusses, always based upon a relationship rather than biology. There was a coinciding regulation determining relationship for benefits flowing from the veteran to a child. However, both sets of prior regulations determining who was a "father" of a child are applicable because the establishment of a paternal relationship was the emphasis of each. Further, because the regulations contained almost identical language, in 1948 they were combined into one regulation. VA RULES AND PROCEDURES § 1045(B) (May 19, 1948). The 1930 regulation states that "[t]he father of an illegitimate child will be deemed to be within the meaning of the word 'father' as used in the said acts *if he shows that the family relationship usual between parent and child existed between him and the child* at the time the child entered service." VA RULES AND PROCEDURES § 1053 (May 19, 1930) (emphasis added). It is clear that the first instance of the regulation promulgated by VA focused on paternal relationship

21

instead of a biological basis. The proof of such relationship remained virtually the same as it had been under the Veterans Bureau, stating that a parental relationship could be proven through public records, statements from two or more persons who knew of the relationship, or a statement from a physician or midwife. VA RULES AND PROCEDURES § 1040(a)-(d) (May 19, 1930). The regulation remained virtually the same until 1943. VA RULES AND PROCEDURES § 1040(a)-(d) (May 19, 1930); VA RULES AND PROCEDURES §§ 1045(B), 1046(A)-(E) (January 25, 1936); VA RULES AND PROCEDURES §§ 1045(B), 1046(A)-(G) (July 10, 1940).

In January 1943, additional types of evidence were added to the list of those acceptable to prove the basis of a paternal relationship. The 1943 regulation explained that the term "public records" included birth certificates and records of baptism as a means of proving a parental relationship. VA RULES AND PROCEDURES § 1046(A) (Jan. 12, 1943). Further, the regulation added that a copy of the family Bible or a census record could be used as evidence to prove a parental relationship. VA RULES AND PROCEDURES § 1046(A) (Jan. 12, 1943). In 1945, VA specifically stated that the "preference shall be given to such father or mother who actually exercised [a] parental relationship." VA RULES AND PROCEDURES § 1041(A) (Nov. 26, 1945) (citing sec. 1, Public Law No. 144, 78th Congress and sec. 1500 Public Law No. 346, 78th Congress). The regulation remained virtually the same until 1948. VA RULES AND PROCEDURES § 1046(A)-(F) (May 21, 1945); VA RULES AND PROCEDURES § 1041(A) (Nov. 26, 1945); VA RULES AND PROCEDURES § 1046(A)-(F) (May 13, 1947).

In May 1948, the regulation was altered again, bearing close resemblance to the current regulation. VA RULES AND PROCEDURES § 1045(B) (May 19, 1948). The regulation remained virtually unchanged until 1963. VA RULES AND PROCEDURES § 1045(B) (Oct. 28, 1954); 38 C.F.R. § 3.210(B) (1959). The last substantive change in the regulation prior to 1963 took place in May 1959. The May 1959 regulation stated:

(B) Illegitimate Child.
(1) As to the mother of an illegitimate child, proof of birth is all that is required. As to the father, proof of relationship of an illegitimate child will consist of:

(a) An acknowledgment in writing signed by him; or

(b) Evidence that he has been judicially ordered or decreed to contribute to the child's support; or

(c) Evidence that the veteran has been, prior to his death, judicially decreed to be the putative father of the child; or

(d) Other satisfactory evidence that the veteran is the putative father of the child, which may include but is not limited to:

> (1) A certified copy of the public record of birth showing that the veteran was named as father of the child; or
>
> (2) Statements of persons who know that the veteran accepted the child as his; or
>
> (3) Information obtained from public records, such as school or welfare agencies, which shows that the veteran was reputed to be the father of the child.

(2) The sufficiency of evidence will be determined in accordance with the facts of the individual case.

(3) When none of the evidence outlined in subdivision (1) (a), (b), or (c) of this subparagraph has been submitted and evidence is on file which is considered adequate to establish the reputed paternity of an illegitimate child as contemplated by subdivision (1)(d) of this subparagraph, the determination will be made by an official authorized to approve such determinations.

38 C.F.R. § 3.210(B) (1963).

In March 1963, the regulation was amended with an "explanation" of the amendments provided. The March 1963 regulation stated:

(B) Illegitimate Child. As to the mother of an illegitimate child, proof of birth is all that is required. As to the father, the sufficiency of evidence will be determined in accordance with the facts in the individual case. Proof of such relationship will consist of:

> (1) An acknowledgment in writing signed by him; or
>
> (2) Evidence that he has been identified as the child's father by a judicial decree ordering him to contribute to the child's support or for other purposes; or

23

(3) Any other secondary evidence which reasonably supports a finding of relationship, as determined by an official authorized to approve such findings, such as:

(a) A certified copy of the public record of birth or church record of baptism, showing that the veteran was the informant and was named as father of the child; or

(b) Statements of persons who know that the veteran accepted the child as his; or

(c) Information obtained from service department or public records, such as school or welfare agencies, which shows that with his knowledge the veteran was named as the father of the child.

38 C.F.R. § 3.210(B) (1963).

The "explanation" section accompanying the March 1963 amendment states that the section "[h]as been revised to require a higher degree of proof than was previously acceptable for establishing the relationship of an illegitimate child to a veteran. . . . The revision requires that paternity[9] be established within a reasonable degree of certainty." Revision Explanation for 38 C.F.R. § 3.210(B) (1963). The reasons given for the revisions focus on an increase in the evidentiary burden to prove a paternal relationship and neither the amended 1963 regulation nor the explanation established a biological requirement as a basis for establishing paternity. The regulation remains virtually unchanged from the 1963 revisions, as can be seen in the current regulation, quoted verbatim above. 38 C.F.R. § 3.210(b) (1987); 38 C.F.R. § 3.210(b) (1994); 38 C.F.R. § 3.210(b) (1995); 38 C.F.R. § 3.210(b) (1996); 38 C.F.R. § 3.210(b) (1997).

Both the majority and my dissent recognize the fact that the Secretary has, three years ago, proposed a change to the current regulation, 38 C.F.R. § 3.210(b). Further, both the majority and my dissent use the proposed regulation to support our position but draw different conclusions regarding the meaning of the proposed regulation, should it ever become final in its current form. In September 2006, VA proposed a change to 38 C.F.R. Part 3 after "reviewing, reorganizing and

---

[9] "Paternity" is defined as "[t]he state or condition of a father; the relationship of a father." BLACK'S at 1126.

24

redrafting the content of the regulations." Dependents and Survivors Proposed Rule, 71 Fed. Reg. 55,052 (Sept. 20, 2006). The proposed change would place the regulations under Part 3 in a new Part 5. *Id.* The stated purpose of this revision is "to reorganize and rewrite in plain language general provisions applicable to its compensation and pension regulations, including those relating to dependent and survivors of veterans and other VA claimants and beneficiaries." *Id.* Although the comments for these proposed changes were due to VA "on or before November 20, 2006," after nearly three years the final version of this regulation, which would include changes implemented pursuant to public comment, has not been published. *Id.* The current regulation 38 C.F.R. § 3.210(b) would fall under the proposed 38 C.F.R. §§ 5.221, 5.229. *Id.*

The proposed changes substitute the term "natural child" to encompass children described in the current regulation as "legitimate" and "illegitimate." The proposed changes explain that the difference between "legitimate" and "illegitimate" "lies in differences in evidence required to *establish a parent-child relationship.* . . . We propose to use the term 'natural child' to designate a child of either category . . . The proposed change in language is *not intended to either diminish or enlarge the group of eligible claimants.*" *Id.* (emphasis added). Thus, the proposed changes maintain the focus that establishment of a paternal relationship is the important factor in determining eligibility to VA benefits. Along the lines of the regulatory history described above, the proposed changes do not include a biological requirement. The majority opinion states that the proposed usage of the term "natural child" implies a biological relationship based on the *Black's* definition of the term. *Ante* at __. However, the full *Black's* definition states that a "natural child" is

> 1. A child by birth, as distinguished from an adopted child. – Also termed *biological child.*
> 2. An *illegitimate child acknowledged by the father.*
> 3. An *illegitimate child.*

BLACK'S at 232-33 (7th ed. 1999) (second and third emphasis added). The *Black's* definition clearly encompasses more than simply a biological child. The term "illegitimate child," as explained above in Part I and II(A), simply means a child "born out of wedlock," which does not imply a biological requirement. BLACK'S at 239. Also, as explained above in Part II(A)(1) and further below in Part III(A), an acknowledgment is based on assumption of parental responsibility and not a biological basis. Further, the proposed change in terms is not intended to alter the group of eligible claimants

25

only avoid the perceived negative connotations associated with the term illegitimate. Thus, the eligibility requirements for the proposed "natural child" are the same as those for the current "illegitimate child."

The proposed regulation retains the same evidentiary requirements now contained in 38 C.F.R. § 3.210(b), highlighted above in Part II(A), but adds additional items that may be used as proof of acknowledgment of a parent-child relationship. Those additions include a copy of the Bible, family records, insurance policies, and census, hospital, employment, naturalization, or immigration records. *Id.* (proposed 38 C.F.R. § 5.229(a)). Notably, the use of a biological or DNA test is not in the proposed changes to the regulation. Lastly, even given the difference of opinion regarding the interpretation of a regulation revised in light of public opinion and not yet published nor binding at the time the events of this case occurred, the majority's interpretation is hardly dispositive, especially considering the significant support by numerous other authority for the position presented in this dissent.

Based on the above, it is clear that the regulation was originally founded on a basis of parental relationship instead of a biological requirement and that foundation of paternal relationship has never been changed despite the numerous opportunities to do so in updates to the regulation. Even the 1963 amendment does not change this basis, instead it only increases the evidentiary burden required to prove it. Further, the proposed changes to 38 C.F.R. § 3.210(b) do not include a biological requirement. There is no biological requirement anywhere in the regulatory history. Instead, the regulatory history clearly shows that the existence of a parental relationship is the focus in determining paternity. Therefore, the regulatory history provides no basis to establish that a biological requirement is longstanding.

The majority finds that I rely too heavily on a "time period in which DNA was not considered as reliable or acceptable as it is today." *Ante* at __. The structure of DNA was first identified in 1953. Lansing M. Presoctt et al., MICROBIOLOGY 193-201, 236-307 (2d ed. 1993). The acceptance of DNA testing as competent evidence in the U.S. court system began in 1987, and "in criminal investigations in the mid-1980s." *DA's Office v. Osborne*, 129 S. Ct. at 2316; *Andrews*, 533 So.2d at 842-43 (1987 rape conviction based on DNA test upheld); *Spencer*, 384 S.E.2d at 775 (Virginia's Supreme Court upheld a 1988 capital murder conviction based on DNA evidence); *see* Anna M.

26

Franceschelli, *Motions for Postconviction DNA Testing: Determining the Standard of Proof Necessary in Granting Requests* 31 CAP. U.L. REV. 243 (2003) (highlighting a brief history of DNA testing in the United States); George Bundy Smith and Janet A. Gordon, *The Admission of DNA Evidence in State and Federal Courts*, 65 FORDHAM L. REV. 2465, 2466 (1997) (same). By 1996, the only states that did not allow DNA testing were Maine, North Dakota, Rhode Island, and Utah. Edward Connors et al., U.S. Dep't of Justice, National Institute of Justice, CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL 7 (1996); *see* Franceschelli, *supra* at 246-47. Currently, 46 states, the District of Columbia, and the Federal government have statutes that cover the usage of DNA testing in particular areas.[10] *Osborne*, 129 S. Ct. at 2326 n.2 (Alito, J. concurring). Additionally, three of the four states without statutes directly covering DNA testing, have caselaw addressing the issue.[11] *Id*. The majority is correct that DNA testing was not available when 38 C.F.R. § 3.210 was originally

---

[10] The relevant statutes for the Federal government, the 46 states, and District of Columbia are as follows: FEDERAL GOVERNMENT - 18 U.S.C. § 3600; ARIZONA - ARIZ. REV. STAT. ANN. § 13-4240 (2001); ARKANSAS - ARK. CODE ANN. § 16-112-2002 (2006); CALIFORNIA - CAL. PENAL CODE ANN. § 1405 (2009); COLORADO - COLO. REV. STAT. ANN. § 18-1-413 (2008); CONNECTICUT - CONN. GEN. STAT. § 52-582 (2009); DELAWARE - DEL. CODE ANN. Tit. 11, § 4504 (2007); DISTRICT OF COLUMBIA - D.C. CODE §§ 22-4133 - 22-4135 (2008 Supp.); FLORIDA - FLA. STAT. § 925.11 (2007); GEORGIA - GA. CODE ANN. § 5-5-41 (Supp. 2008); HAWAII - HAW. REV. STAT. § 844D-123 (2008 Cum. Supp.); IDAHO - IDAHO CODE § 19-4902 (2004); ILLINOIS - ILL. COMP. STAT. 5/116-3 (2006); INDIANA - IND. CODE ANN. § 35-38-7-5 (2004); IOWA - IOWA CODE § 81-10 (2009); KANSAS - KAN. STAT. ANN. § 21-2512 (2007); KENTUCKY - KY. REV. STAT. ANN. § 422.285 (2008); LOUISIANA - LA. CODE CRIM. PROC. ANN., Art. 926-1 (2009); MAINE - ME. REV. STAT. ANN. Tit. 15 § 2137 (Supp. 2008); MARYLAND - MD. CRIM. PROC. CODE ANN. § 8-201 (2008); MICHIGAN - MICH. COMP. LAWS ANN. § 770-16 (2009); MINNESOTA - MINN. STAT. § 590-01 (2008); MISSISSIPPI - 2009 Miss. Laws 2709; MISSOURI - MO. REV. STAT. § 547-035 (2008 Cum. Supp.); MONTANA - MONT. CODE ANN. § 46-21-110 (2007); NEBRASKA - NEB. REV. STAT. § 29-4120 (2008); NEVADA - NEV. REV. STAT. § 176-0918 (2007); NEW HAMPSHIRE - N. H. REV. STAT. ANN. § 651-D:2 (2007); NEW JERSEY - N. J. STAT. ANN. § 2A:84A-32a (Supp. 2009); NEW MEXICO - N.M. STAT. ANN. § 31-1A-2 (Supp. 2008); NEW YORK - N. Y. CRIM. PROC. LAW ANN. § 440-30(1-a) (2005); NORTH CAROLINA - N. C. GEN. STAT. ANN. § 15A-269 (2007); NORTH DAKOTA - N. D. CENT. CODE ANN. § 29-32.1-15 (2006); OHIO - OHIO REV. CODE ANN. § 2953-72 (2009); OREGON - ORE. REV. STAT. § 138.690 (2007); PENNSYLVANIA - 42 PA. CONS. STAT. § 9543 (2006); RHODE ISLAND - R. I. GEN. LAWS § 10-9.1-11 (Supp. 2008); SOUTH CAROLINA - S.C. CODE ANN. § 17-28-30 (Supp. 2008); SOUTH DAKOTA - 2009 S.D. SESS. LAWS 1166; TENNESSEE - TENN. CODE ANN. § 40-30-304 (2006); TEXAS - TEX. CODE CRIM. PROC. ANN. Arts. 64.01-64.05 (Supp. 2008); UTAH - UTAH CODE ANN. § 78B-9-300 - 78B-9-304 (2008 Supp.); VERMONT - VT. STAT. ANN. Tit. 13, § 5561 (Supp. 2008); VIRGINIA - VA. CODE ANN. § 19.2-327.1 (2008); WASHINGTON - WASH. REV. CODE § 10.73.170 (2008); WEST VIRGINIA - W. VA. CODE ANN. § 15-2B-14 (2008); WISCONSIN - WIS. STAT. § 974.07 (2005); WYOMING - WYO. STAT. ANN. § 7-12-303 (2008 Supp.).

[11] Alabama, Alaska, Massachusetts, and Oklahoma do not have statutes covering DNA testing. However, Alabama, Alaska, and Massachusetts all have relevant caselaw. *See, e.g.*, *Fagan v. State*, 957 So. 2d 1159 (Ala. Crim. App. 2007); *Osborne v. State*, 110 P. 3d 986 (Alaska App. 2005); *Commonwealth v. Donald*, 848 N.E.2d 447 (Mass. App. Ct. 2006).

written. However, 38 C.F.R. § 3.210 has been revised or reviewed at least 4 times since 1987 when the United States court system first began using DNA testing. To use the building analogy once again, the foundation the regulation was built on was clearly paternal responsibility and the establishment of a paternal relationship. The regulation, as highlighted above, has been revised numerous times, but none of the revisions changed the foundation, only changed the pattern of the brickwork. I fail to see how such a foundational change as adding a biological requirement, which could have easily been added by the Secretary, is now read into the regulation by way of implication.

*2. Court Precedent*

My research finds only one case that has been before the Court in which the qualification of biological paternity appears. The case is *Burch v. Brown*, 6 Vet.App. 512 (1994) and was not cited (and therefore not interpreted) in either party's brief.

The majority opinion states that this Court's holding in *Burch* supports a need for a biological requirement in establishing paternity. *Ante* at __ n.1; *Burch*, 6 Vet.App. at 513. In *Burch*, the Court stated that "[t]he Board concluded that because the children 'are not biological children of the veteran and they do not qualify as adopted children, they do not fall within the purview of the VA's definition of "child" for the purposes of improved death pension benefits.'" *Id*. The Court determined that "[a]lthough appellant was granted legal custody of [the two children of her niece], neither can be considered a 'child' as the term is defined by 38 U.S.C. § 101(4)." *Id*. In that case, Mrs. Burch was awarded custody of the two children of her niece in March 1991, 13 years after Mr. Burch, the veteran, died. *Id*. at 512. However, the argument was never presented nor addressed by the Court as to whether *Mr. Burch* assumed parental responsibilities. *Id*. Instead, the Court decided whether children who became dependents of Mrs. Burch after her husband's death could qualify for benefits based on her status as the widow of a veteran. The opinion does not address whether there is a biological requirement to determine who qualifies as a "father." The Court's opinion merely quotes the Board decision that states that there is no biological connection between the veteran and the dependents. However, Board decisions are not considered precedential and are binding only with regard to the specific case addressed in each decision. *Hillyard v. Derwinski*, 1 Vet.App. 349, 351 (1991). As VA's regulations specifically state, "previously issued Board decisions will be considered

binding only with regard to the specific case decided." 38 C.F.R. § 20.1303.  Therefore, *Burch* does not provide a basis that a biological requirement is longstanding.

### 3. Internal Document and Additional Regulation

There is an internal VA document concerning biological testing dating back to March 1963. VA Compensation & Pension Transmittal Sheet at 286.  However, "[i]nterpretations such as those in opinion letters . . . do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *see Sursely v. Peake*, 551 F.3d. 1351, 1353-55 n.2 (Fed. Cir. 2009) ("Director's opinion letter is not the type of formal exercise of delegated authority entitled to deference under *Chevron*." (citing *United States v. Mead Corp.*, 533 U.S. 218, 233-374 (2001))).  Therefore, even if the internal document is considered in the most positive light and deemed an "opinion letter," it is not required that the Court give substantial deference to the Secretary's interpretation based on this document. *Chevron*, 467 U.S. at 843-44.

The Secretary argues that 38 C.F.R. § 17.272 contemplates the use of diagnostic tests and supports the Secretary's contention that the interpretation is longstanding.  However, 38 C.F.R. § 17.272 states that "[d]iagnostic tests to establish paternity of a child" are "specifically excluded from [the] program."  The program addressed in the regulation is "Medical Care for Survivors and Dependents of Certain Veterans."  38 C.F.R. § 17.272 (2009).  The regulation contemplates DNA testing but only to state that it is not of sufficient importance to warrant VA funding.  Contrary to the Secretary's contention, this language seems to indicate that VA does not believe DNA testing is important.

Neither the majority opinion nor the Secretary present any valid reason why this interpretation should be considered longstanding.  Indeed, the regulatory history of 38 C.F.R. § 3.210(b) shows that the relationship between a child and the person reputed to be the illegitimate child's father is the key factor in determining whether the child is entitled to benefits.  The Court is not required to give substantial deference to internal opinion letters and this Court's holding in *Burch* does not address, let alone establish, an interpretation that there is a biological requirement in determining who is the father of a child seeking VA benefits.

29

## C. Absurd Result Exception

A statutory or regulatory construction "that causes absurd results is to be avoided if at all possible." *Timex V.I. v. United States*, 157 F.3d 879, 886 (1998) (citing *Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68-69 (1994); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527-29 (1989 (Scalia, J., concurring)). The argument was presented that an interpretation that there is no biological requirement leads to an "absurd result." The "'absurd result' exception to the plain meaning rule is, however, narrow and limited to situations 'where it is quite impossible that Congress could have intended the result . . . and where the alleged absurdity is so clear as to be obvious to most anyone.'" *Gardner v. Derwinski*, 1 Vet.App. 584, 587 (1991) (quoting *Pub. Citizen v. U.S. Department of Justice*, 491 U.S. 440, 470-71 (1989) (Kennedy, J., concurring)). However, the result that someone may be found the "father" despite a lack of a biological relationship is no more absurd than the "marital presumption" that assumes that a child born to married parents is the child of the husband. BLACK's at 225 (8th ed. 2004); *see* Angela Chesney Herrington, *For Love or Money: The Kansas Supreme Court's Problematic Acceptance of the "Best Interests of the Child" Standard in an Intestate Claim*, 47 WASHBURN L.J. 177, 182 (2007) (stating that the Kansas Supreme Court "recognized the historical marital presumption of paternity [a]s one of the strongest presumptions under the law"). Further, that argument disregards the common law basis of voluntary assumption of parental responsibilities as a basis of establishing paternity.

Instead, I find that biology as the only basis for establishing paternity leads to an absurd result. For example, assume that a married veteran raises a child birthed by his wife. Assume that the veteran signs as the father on the birth certificate, baptismal and school records; spends his time, money, and energy on the child; and holds himself out to the community as the father. However, after the veteran's death, the child is denied benefits because the veteran is determined by a DNA test to, in fact, not be the biological father. I find this result to be far more absurd. As the Supreme Court has stated, "*Paternal rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.*" *Lehr v. Robertson*, 463 U.S. 248, 260 (1983) (quoting *Caban v. Mohammed*, 441 U.S. 380, 397 (1979), Stewart, J., dissenting); *see Smith v. Org. of Foster Families for Equality and Reform*, 431 U.S. 816, 844 (1977) ("[The] importance

of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in '[promoting] a way of life' through the instruction of children . . . as well as from the fact of blood relationship." (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 231-233 (1972)).  Based on the above explanation I do not find the Secretary's interpretation of 38 C.F.R. § 3.210 to be self-explanatory nor longstanding.  *See Jong Ha Wang*, 450 U.S. at 144.

## III.  ADDITIONAL LEGAL SUPPORT

### A.  State Laws Concerning Paternity

The vast majority of statutes, case law, regulations, and legal scholarship support the premise that paternity is based on a parental relationship and the assumption of parental responsibilities rather than a biological basis.  The various federal statutes, regulations, and departments provide for the establishment of paternity based on a parental relationship.[12]  As 42 U.S.C. § 666(a)(5), which governs entitlement to Social Security benefits, states that the "[p]rocedures concerning paternity establishment" include genetic testing, but also include voluntary paternity acknowledgment, and signed paternity acknowledgment.  Both voluntary paternity and signed acknowledgment are mentioned as alternatives to genetic testing, thus establishing that a non-biological relationship can establish paternity for purposes of Social Security benefits.  Further, this highlights that when biology is the basis for establishing paternity, it must be clearly specified.  Additionally the Uniform Parentage Act of 2002, states that the definition of "father" includes: a presumed father - one who was married to the birth mother at conception or lived with the child for the first two years of the child's life and treated the child as his; a putative father - alleged or reputed father of a child born out of wedlock; a man who acknowledged paternity; a man who was adjudicated the father in a paternity

---

[12]  42 U.S.C. § 666 (a)(5)(c); 45 C.F.R. § 302.70 (requiring each state to have "[p]rocedures for a simple civil process for voluntarily acknowledging paternity."); Uniform Parentage Act § 4 (a) (4), (5) (1973); 9 UNIFORM LAWS ANN. (Supp. 1975, at 186); UNIFORM PARENTAGE ACT § 102(1) (amended 2002) (explained further "[u]nder both the federal statute and the UPA 2002, a man may voluntarily acknowledge his paternity as long as the mother consents.  Neither Title IV-D nor the UPA 2002 requires a genetic test prior to the establishment of paternity, an indication that the 'acknowledged father' may not always be the genetic father." Jayna Morse Cacioppo, *Voluntary Acknowledgments of Paternity: Should Biology Play a Role in Determining Who Can be a Legal Father?*, 38 IND. L. REV. 479, 489 (2005)); U.S. Department of Health and Human Services, Office of Child Support Enforcement Guidelines, *available at* www.acf.hhs.gov (explained further in Cacioppo, *supra*).

action; an adoptive father; a man who consents to assisted reproduction; and an adjudicated father in a proceeding confining a gestational agreement.

The majority of case law concerning paternity is dealt with at a state level because the authority to legislate family law is, in the main, delegated to the states. The majority of states, in one fashion or another, provide for paternity to be established based on a parental relationship instead of simply on biology.[13] As the Supreme Court of Idaho stated, "[m]ere biology does not create a

---

[13] ALABAMA - *Ex parte Jenkins*, 723 So. 2d 649, 652-653 (Ala. 1998) ("'Any interested party may bring an action at any time for the purpose of determining the existence or non-existence of the father and child relationship.'"(citing ALA. CODE 1975; § 26-17-6(b))); ARIZONA - *Ban v. Quigley*, 812 P.2d 1014, 1016-17 (Ariz. Ct. App. 1990); ARKANSAS - ARK. CODE ANN. § 9-10-115 (2002 & Supp. 2003); CALIFORNIA - *In re Marriage of Pedregon*, 107 Cal. App. 4th 1284 (Ct. App. 2003) (ruling that where the husband held out a nonbiological child as his own, he established the paternal relationship and was required to pay child support); *In re Nicholas H.*, 28 Cal. 4th 56, 63 (2002) ("[A] man does not lose his status as a presumed father by admitting he is not the biological father."); *Adoption of Michael H.*, 10 Cal. 4th 1043, 150-53 (1995); CAL. FAM. CODE § 7570 (2009); COLORADO - *People v. R.L.C.*, 47 P.3d 327, 333 (Colo. 2002) ("[T]he child's interests must also be considered when deciding whether to permit a legal father to reopen a judgment of paternity. We are not persuaded that it is in the best interests of a child to permit an existing parent-child relationship to be subjected to endless question and challenge."); COLO. REV. STAT. ANN. § 19-4-107(1)(b); DELAWARE - *B.M.H. v. M.J.P.*, 2003 Del. Fam. Ct. LEXIS 111 (Del. Fam. Ct. July 24, 2003); *but see Smith v. Gordon*, 968 A.2d 1 (Del. 2009); FLORIDA - *Dep't of Health & Rehabilitative Servs. v. Privette*, 617 So. 2d 305 (Fla. 1993); *G.F.C. v. S.G.*, 686 So. 2d 1382, 1385 (Fla. Dist. Ct. App. 1997); GEORGIA - *Baker v. Baker*, 582 S.E.2d 102, 104 (Ga. 2003) (citing *Davis v. LaBrec*, 274 Ga. 5, 7 (549 S.E.2d 76) (2001)); HAWAII - *Child Support Enforcement Agency v. Doe*, 963 P.2d 1135, 1138 (Haw. Ct. App. 1998); IDAHO - *Doe v. Roe (In re Doe)*, 142 Idaho 202, 205 (Idaho 2005) ("Mere biology does not create a father with legal rights and responsibilities to a minor child."); INDIANA - *In re Paternity of E.M.L.G.*, 863 N.E.2d 867, 869 (Ind. Ct. App. 2007) ("'[a] man is a child's legal father if the man executed a paternity affidavit in accordance with Indiana Code section 16-37-2-2.1 . . . .'" (quoting Ind. Code § 16-3114-7-3 (2001))); *In re Paternity of J.A.C.*, 734 N.E.2d 1057, 1060 (Ind. Ct. App. 2000) (Robb, J., concurring) (execution of a paternity affidavit establishes paternity, and thus it was "completely unnecessary" for the father to have to prove his paternity in a later paternity action), however this only applies when there is a belief that the child is the biological offspring of the parent, even if believed incorrectly, *Seger v. Seger*, 780 N.E.2d 855, 857 (Ind. Ct. App. 2002); IOWA - *Callender v. Skiles*, 623 N.W.2d 852, 856 (Iowa 2001); IOWA CODE ANN. § 600B.41; KANSAS - *Ferguson v. Winston*, 996 P.2d 841, 844-45 (Kan. Ct. App. 2000); KENTUCKY - *S.R.D. v. T.L.B.* 174 S.W. 3d 502 (Ky. Ct. App. 2005); *J.N.R. v. O'Reilly*, 264 S.W. 3d 587 (Ky. 2008); LOUISIANA - *Leger v. Leger*, 829 So. 2d 1101 (La. Ct. App. 2002) (ruling that wife had no legal authority to rebut presumption of husband's paternity when the child was born during the marriage or within 300 days after the divorce); *Smith v. Jones*, 566 So. 2d 408 (La. Ct. App. 1990) (admitting DNA evidence presented by biological father but finding that the child may have two "fathers," i.e., "dual paternity"); *but see Faucheux v. Faucheux*, 772 So. 2d 237 (2000); MAINE - *Philbrook v. Theriault*, 957 A.2d 74, 79 (Me. 2008); *C.E.W. v. D.E.W.*, 845 A.2d 1147, 1151 (Me. 2004); *Stitham v. Henderson*, 768 A.2d 598, 603 (Me. 2001); MARYLAND - *Evans v. Wilson*, 382 Md. 614, 623 (Md. 2004); MASSACHUSETTS - *In re Paternity of Cheryl*, 746 N.E.2d 488, 490 (Mass. 2001); MICHIGAN - *Sinicropi v. Mazurek*, 273 Mich. App. 149, 161 (Mich. Ct. App. 2006); MINNESOTA - *Witso v. Overby*, 609 N.W.2d 618, 623 (Minn. Ct. App. 2000); MISSOURI - *Walker v. Walker*, 280 S.W.3d 634, 637 (Mo. Ct. App. 2009); *but see Jefferson v. Jefferson*, 137 S.W.3d 510 (Mo. Ct. App. 2004); MONTANA - *In re Paternity of Adam*, 903 P.2d 207, 210-11 (Mont. 1995); MONT. CODE ANN., § 40-6-105 (2007); NEBRASKA - *State ex rel. Hopkins v. Batt*, 253 Neb. 852, 862 (Neb. 1998); NEVADA - *Love v. Love*, 114 Nev. 572, 578 (Nev. 1998) ("[W]hich presumptions are 'founded on the weightier considerations of policy and logic.'"); *Russo v. Gardner*, 114 Nev. 283, 284 (Nev. 1998); NEW HAMPSHIRE - *Watts v. Watts*, 337 A.2d 350, 351 (N.H. 1975); NEW JERSEY - *F.B. v. A.L.G.*, 821 A.2d 1157 (N.J. 2003) (denying motion of putative father to vacate paternity judgment several years after he waived

father with legal rights and responsibilities to a minor child." *Doe v. Roe (In re Doe)*, 142 Idaho 202,

right to genetic tests and acknowledged paternity because he did not prove fraud and he had acted as the father for eight years); NEW YORK - *In re Adoption of Anonymous*, 74 Misc. 2d 99 (N.Y. Sur. Ct. 1973); NORTH CAROLINA - *Ambrose v. Ambrose*, 140 N.C. App. 545, 546 (N.C. Ct. App. 2000); *but see Wright v. Wright*, 281 N.C. 159, 172 (N.C. 1972); NORTH DAKOTA - *K.E.N. v. R.C.*, 513 N.W.2d 892, 897 (N.D. 1994); OHIO - *Poskarbiewicz v. Poskarbiewicz*, 787 N.E.2d 688 (Ohio Ct. App. 2003) (ruling that, although the child and the mother's husband were not blood-related, severing the parent-child relationship between child and mother's husband would not be in the best interest of the child); OREGON - *Sleeper & Sleeper*, 982 P.2d 1126 (Or. 1999); OR. REV. STAT. ANN. § 109.119 (granting rights to "a person who establishes emotional ties creating child-parent relationship or ongoing personal relationship"); PENNSYLVANIA - *Grassmyer v. Coleman*, 345 Pa. Super. 358, 361 (Pa. Super. Ct. 1985) (citing *Commonwealth ex rel. Hall v. Hall*, 215 Pa. Super. 24, 257 A.2d 269 (Pa. Super. Ct. 1969); *Commonwealth ex rel. Gonzalez v. Andreas*, 245 Pa. Super. 307, 369 A.2d 416 (1976); RHODE ISLAND - *Pettinato v. Pettinato*, 582 A.2d 909, 913 (R.I. 1990) ("[G]enetic blood test results offered into evidence were not relevant because legal paternity had been established and biological paternity was not at issue." (citing *Scott v. Mershon*, 394 Pa. Super. 411, 576 A.2d 67, 71 (1990))); SOUTH CAROLINA - *Dodge v. Dodge*, 505 S.E.2d 344, 348 (S.C. Ct. App. 1998) (natural parents have superior rights in custody disputes with third parties; superior rights "yield" where the interest and welfare of the child clearly require alternative custodial supervision); SOUTH DAKOTA - *Culhane v. Michels*, 615 N.W.2d 580, 589 (S.D. 2000) (denying genetic testing where father challenged paternity of marital children whom he had acknowledged as his own for 18 years); TENNESSEE - *State ex rel. Robinson v. Glenn*, 2007 Tenn. App. LEXIS 255 (Tenn. Ct. App. Apr. 26, 2007) ("However, when a man executes a VAP [(voluntary acknowledgment of paternity)], he acknowledges that he accepts responsibility of being a parent to the child, and most importantly, he specifically waives his right to genetic testing."); *State ex rel. Hickman v. Dodd*, 2008 Tenn. App. LEXIS 699 (Tenn. Ct. App. Nov. 21, 2008); *State Dep't of Human Servs. ex rel. Ellis v. Humes*, 2005 Tenn. App. LEXIS 145 (Tenn. Ct. App. Mar. 10, 2005); TENN. CODE ANN. § 24-7-113 (2009); TEXAS - *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993); *Espree v. Guillory*, 753 S.W.2d 722, 724 (Tex. App. 1988); UTAH - *Pearson v. Pearson*, 182 P.3d 353, 354 (Utah 2008); VERMONT - *Godin v. Godin*, 725 A.2d 904, 910 (Vt. 1998) (denying husband's motion for paternity testing, citing the marital presumption of paternity and the superior interests of the state, the family, and the child in "maintaining the continuity, financial support, and psychological security of an established parent-child relationship"); VIRGINIA - VA. CODE ANN. § 20-49.1 (2004); WASHINGTON - *In re Marriage of Wendy M.*, 962 P.2d 130, 132 (Wash. Ct. App. 1998); WEST VIRGINIA - *State ex rel. West Virginia Dep't of Health & Human Resources v. Michael George K.*, 531 S.E.2d 669, 674-75 (W. Va. 2000) ("[I]f a person has held himself out as the father of a child for such a time that disproof of paternity would result in undeniable harm to the child, blood test results may be ruled to be inadmissible." (citing *Michael K.T. v. Tina L.T.*, 182 W. Va. 399, 387 S.E.2d 866 (1989))); WISCONSIN - *Randy A. J. v. Norma I. J.*, 677 N.W.2d 630, 637 (Wis. 2004) ("[W]hen determining the level of relationship that is necessary before a putative father may assert parental rights of a constitutional dimension, we returned to the direction given by the [United States] Supreme Court . . . where the Supreme Court's decisions were driven by the actual responsibility for the child the father had assumed." (citing *W.W.W. v. M.C.S.*, 161 Wis. 2d 1015, 1331-32 (1991))); WIS. STAT. ANN. § 767.245 (2003) (granting rights to a person who "maintained a relationship similar to a parent-child relationship"); *contra* ALASKA - *Dep't of Revenue, Child Support Enforcement Div. v. Button*, 7 P.3d 74 (Alaska 2000) (allowing DNA evidence to be admitted nine years after paternity acknowledgment by nonbiological father); CONNECTICUT - *Weidenbacher v. Duclos*, 234 Conn. 51, 69 (Conn. 1995); ILLINOIS - *In re Marriage of Adams*, 701 N.E.2d 1131 (Ill. App. Ct. 1993) (permitting disestablishment of paternity despite 10 year relationship with child, finding best interests of the child not relevant to decision); 750 ILL. COMP. STAT. ANN. 45/7(b-5); MISSISSIPPI - *M.A.S. v. Miss. Dep't of Human Servs.*, 842 So. 2d 527 (Miss. 2003) (allowing DNA evidence to be admitted nine years after paternity acknowledgment by minor nonbiological father because it would be "profoundly unjust" to require him to continue to make payments); NEW MEXICO - *Lane v. Lane*, 121 N.M. 414, 417 (N.M. Ct. App. 1996); OKLAHOMA - *Dep't of Human Servs. v. Chisum*, 85 P.3d 860 (Okla. Civ. App. 2004) (granting motion to disestablish paternity finding that genetic testing excluding father created "material mistake of fact" and that neither equity nor the best interests of the child applied in paternity cases where genetic testing excluded the movant); WYOMING - *MAM v. State Dep't of Family Servs.*, 99 P.3d 982 (Wyo. 2004) (permitting legal father to reopen paternity judgment because, among other things, the court record did not establish that the man had been informed of his right to genetic testing).

33

205 (Idaho 2005).

## B. Legal Scholarship

Many legal scholars have emphasized the constitutional importance of a fully developed relationship in determining parental rights. As one legal scholar stated, "the unwed father's interest springs not from his biological tie with his illegitimate child, but rather, from the relationship he has established with and the responsibility he has shouldered for his child." John T. Wright, *Caban v. Mohammed: Extending the Rights of Unwed Fathers*, 46 BROOK. L. REV. 95, 115-116 (1979); *see* Donald L. Swanson, *The Putative Father's Parental Rights: A Focus on "Family,"* 58 NEB. L. REV. 610, 617 (1979) ("[A] putative father's failure to show a substantial interest in his child's welfare and to employ methods provided by state law for solidifying his parental rights . . . will remove from him the full constitutional protection afforded the parental rights of other classes of parents . . . ."); Mary F. Radford, *Constitutional Law - Equal Protection - Caban v. Mohammed*, 29 EMORY L.J. 833, 854 (1980) ("an unwed father's rights in his child do not spring solely from the biological fact of his parentage, but rather from his willingness to admit his paternity and express some tangible interest in the child").[14]

Assumption of paternal responsibility and establishment of a paternal relationship is tantamount to determining who is the "father." However, the next consideration is whether the evidence presented is sufficient. 38 C.F.R. § 3.201(b) ("As to the father, the sufficiency of evidence will be determined in accordance with the facts of the individual case.")

## IV. APPLICATION TO CASE

Despite our disagreement with the roads to travel, the fork in the road that I take leads me to the same destination as the one taken by the majority. However, it was the application of the provisions of § 3.210(b), as I have described them above, that was my compass.

---

[14] For further information see Anne B. Poulin, *Illegitimacy and Family Privacy: A Note on Maternal Cooperation in Paternity Suits*, 70 NW. U. L. REV. 910, 916-919 (1976); *Developments in the Law - The Constitution and the Family*, 93 HARV. L. REV. 1156, 1275-1277 (1980); *Constitutional Law - Fourteenth Amendment - Equal Protection Clause - Rights of Putative Fathers*, 18 DUQ. L. REV. 375, 383-84 n. 73 (1980); Note, 19 J. FAM. L. 440, 460 (1980); Juliann J. Sitoski, *Limiting the Boundaries of Stanley v. Illinois: Caban v. Mohammad*, 57 DENV. L. J. 671, 680-83 (1980); *Unwed Fathers: An Analytical Survey of Their Parental Rights and Obligations*, 1979 WASH. U.L.Q. 1029, 1035; Note, 12 U.C. DAVIS L. REV. 412, 450 n.218 (1979).

In the case before us now, there is no signed written acknowledgment (§ 3.21(b)(1)), no judicial decrees (§ 3.21(b)(2)), no birth certificate listing Mr. Dover as the father (§ 3.21(b)(3)(i)), and no service department or public records that show Mr. Dover was the father of the child (§ 3.21(b)(3)(iii)). The only evidence cited to prove paternity is based on statements by the veteran's sisters, stating Mr. Dover's intentions to accept the then unborn child as his own. 38 U.S.C. § 3.21(b)(3)(ii). However, these statements that were made 11 years after Mr. Dover's death and, that his sisters interpreted to be their brother's expression of his intention to develop a relationship with the child at some point after the child's birth, even if accurate, can best be described as conditional. Most important here, is the fact that this relationship, even if intended, was never actually established. Mr. Dover died more than 8 months before the child was born, so no relationship could have existed. Thus, in my view, the evidence is legally insufficient to establish that Mr. Dover assumed paternal responsibility or established any relationship with the child, requirements I find to be mandated by § 3.210(b). Therefore, although the Board erred in considering the DNA test as being dispositive, it properly determined that the remaining evidence is insufficient to establish paternity. Thus, I concur with the majority's ultimate result but dissent with the reasoning they provide. Because the evidence of record, even viewed in the light most favorable to Ms. McDowell and T.M., fails to establish a legally recognizable paternal relationship, I find it impossible to hold that Mr. Dover is the father of T.M. for the purposes of veterans benefits. *Valiao v. Principi*, 17 Vet.App. 229, 232 (2003) (holding that "[w]here the facts averred by a claimant cannot conceivably result in any disposition of the appeal other than affirmance of the Board decision, the case should not be remanded for development that could not possibly change the outcome of the decision"); *see Soyini v. Derwinski*, 1 Vet.App. 540, 546 (1991).

For the reasons stated above, I respectfully dissent from my colleagues's finding that there must be a biological connection between the veteran and the child. For reasons different than those of the majority, however, I can find no paternal relationship between Mr. Dover and T.M. and thus concur in the result.